IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INCARCERATED ENTERTAINMENT, LLC ) | |
| ) | |
| Plaintiff, ) | |
| ) Civil Action No. _____ | |
| v. ) | |
| ) **JURY TRIAL DEMANDED** | |
| SIMON & SCHUSTER DIGITAL SALES INC., ) | |
| SIMON & SCHUSTER, INC., and ) | |
| GUY LAWSON ) | |
| ) | |
| Defendants. ) | |
| ) | |

## COMPLAINT

For its Complaint, Plaintiff Incarcerated Entertainment, LLC ("IE"), by and through the undersigned counsel, alleges as follows:

## THE PARTIES

1. IE is a Florida limited liability company with a place of business located 2901 Kensington Trace, Tarpon Springs, Florida 24688.

2. Defendant Simon & Schuster Digital Sales Inc. is a Delaware company with, upon information and belief, a place of business located at 51 West 52d Street, New York, New York 10019.

3. Defendant Simon & Schuster, Inc. is a New York company with, upon information and belief, a place of business located at 1230 Avenue of the Americas, New York, New York 10020.

4. Defendant Guy Lawson ("Lawson") is a New York citizen residing at 48 Livingston Street, Rhinebeck, New York 12572.

**JURISDICTION AND VENUE**

5. For those claims for relief arising under the Copyright Act, 17 U.S.C. § 501 *et seq.*, and under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, this Court has original subject matter jurisdiction pursuant to the provisions of 28 U.S.C. §§ 1331 and 1338(a) and (b) and 15 U.S.C. § 1121(a).

6. This Court has supplemental jurisdiction over IE's additional claims under 28 U.S.C. § 1367(a). These claims are so related to the claims in this case over which this Court has original jurisdiction that they form a part of the same case or controversy under Article III of the United States Constitution.

7. Upon information and belief, Defendants conduct substantial business in this forum, directly or through intermediaries, including: (i) at least a portion of the infringements alleged herein; and (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct and/or deriving substantial revenue from goods and services provided to individuals in this district.

8. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a).

**BACKGROUND**

9. At the age of 18, Efraim Diveroli ("Diveroli") started a small business specializing in arms, ammunition trading, and bidding on small United States Government defense contracts. Using one of his father's shuttered companies, AEY, Inc. ("AEY"), Diveroli worked on a laptop out of his one-room apartment bidding on United States Government contracts through www.FBO.gov.

10. Diveroli steadily increased his contracts over the course of the next three years and developed a track record of success in satisfying over 100 United States Government contracts for weapons and munitions.

11. By 2007, the United States Government's war effort in Afghanistan was in full force. The allied forces decided to arm the Afghans for purposes of fighting the Taliban and Al Qaeda, so the U.S. Government bid out a massive contract for purposes of arming the fledgling Afghan army (and its related police forces). Although large contractors like Northrop Grumman and Lockheed prepared extensive bids for the projects, ultimately the United States Government—after significant vetting—chose Diveroli and AEY to fulfill these massive $298 million weapons and munitions contracts.

12. Throughout 2007 and early 2008, Diveroli was the sole director and owner of AEY, and the driving force behind its success. He relied on a handful of lower level employees and independent contractors to assist the business, one of whom was David Packouz, a neighborhood acquaintance.

13. On March 27, 2008, the United States Government suspended AEY's contracts based upon allegations that AEY had violated pre-existing arms embargos. Part of those accusations were that certain ammunitions – none of which were defective – supplied to the Afghans and the United States Army were sourced from China in violation of an embargo. Diveroli, who at the time was just 22 years old, was indicted by a Miami Federal grand jury based upon fraud charges in connection with the provision of ammunition to the Afghans.

14. Rather than defend the legality of his actions – in that Diveroli had been selling ammunition acquired by his third-party sources prior to the 1989 Chinese munitions embargo –

Diveroli decided for various reasons to take a four-year plea deal to plead guilty to a single count of conspiracy.

15.     Shortly after entering his plea deal, Diveroli began serving his forty-eight-month sentence. Between early 2011 and October 2011, Diveroli served time in the Seminole County, Florida jail. Diveroli served the majority of his sentence, starting in October 2011, at the Coleman Federal Corrections Complex ("Coleman") in Wildwood, Florida, a low to mid-level detention facility.

16.     Before his sentencing, Diveroli was contacted by Lawson, who expressed his interest in writing an article recounting Diveroli's larger-than-life story of becoming an arms dealer or "gun runner" before the age of 21. Diveroli declined to be interviewed by Lawson prior to reaching his plea deal and being sentenced.

17.     In or about early 2011, after Diveroli's sentencing and while serving his sentence, Lawson again contacted Diveroli, this time through Diveroli's counsel. Despite Diveroli's initial reluctance, Lawson was insistent on conducting a jailhouse telephone interview with Diveroli and explained his past success in writing biographical accounts of larger-than-life stories that enjoyed commercial success. Lawson represented that he could likely get an article about Diveroli published in *Rolling Stone* magazine.

18.     On March 16, 2011 *Rolling Stone* published Lawson's article, *The Stoner Arms Dealers: How Two American Kids Became Big-Time Weapons Traders* (the "Rolling Stone Article"). The *Rolling Stone* Article featured accounts of Diveroli experiences, obtained from correspondence with him, and from Diveroli's former independent contractor David Packouz (who was sentenced to only house arrest).

19.     In late 2011, Lawson again contacted Diveroli. Lawson sought to expand on the

4

information obtained in the original jailhouse interview and contained in the *Rolling Stone* Article.

20. In January 2012, Diveroli authored and wrote his manuscript about his experiences being a gun runner; the manuscript is entitled "Once a Gun Runner . . ." (hereinafter the "January 2012 Manuscript").

21. Diveroli assigned all his rights in the January 2012 Manuscript to IE.

22. IE owns a valid copyright for the January 2012 Manuscript," which is registered with the United States Copyright Office. A true and correct copy of the Certificate of Registration, bearing United States Copyright Registration TXu-985-899 is attached hereto as Exhibit A.

23. From November 2013 to June 2014, Diveroli expanded his original January 2012 Manuscript into a full draft. By February 2014, that full draft (the "February 2014 Manuscript") was sufficiently complete for marketing Diveroli's life rights. The February 2014 Manuscript is registered with the United States Copyright Office as United States Copyright Registration TXU001911676, and IE is the owner by assignment of that copyright registration.

24. The February 2014 Manuscript – Diveroli's memoir – is offered for sale as a book entitled "Once A Gun Runner…" Below is an image of the cover of the book:



25. From his receipt of the January 2012 Manuscript until November 2013, Lawson continued exchanging e-mails seeking to solicit information from Diveroli.

26. In June 2014, Diveroli wrote to Lawson (with the assistance of Diveroli's sister) to confirm that "you are NOT free to quote me on ANYTHING at this time, as I have made no comments thus far." In response, Lawson confirmed "I would never quote you on anything without your consent, of course."

27. A true and correct copy of that e-mail exchange (the "Agreement"") is attached hereto as Exhibit B.

28. Despite the Agreement, Lawson used the January 2012 Manuscript to quote Diveroli in the book "*Arms and the Dudes: How Three Stoners from Miami Beach Became the Most Unlikely Gunrunners in History*," now known as "*War Dogs*" (referred to herein as "*War Dogs*").

29. Upon information and belief, Defendant Simon & Schuster, Inc. provided Lawson direction and editorial assistance.

30. On October 9, 2014, counsel for Diveroli sent a letter to Defendant Simon & Schuster, Inc. regarding Lawson's manuscript that became *War Dogs*.

31. Defendant Simon & Schuster, Inc. responded to the letter on February 4, 2015, a true and correct copy of which is attached as Exhibit C, stating "We note that while Mr. Lawson did not interview Mr. Diveroli in person, they spoke on the phone and had extensive email exchanges."

32. Thus, Defendant Simon & Schuster, Inc. admitted Lawson had received written material from Diveroli.

33. On June 9, 2015, *War Dogs* published.

## COUNT I – INFRINGEMENT OF U.S. COPYRIGHT REGISTRATION TXu-985-899
(Against All Defendants)

34. IE repeats and realleges the allegations of paragraphs 1 through 33 as if fully set forth herein.

35. Lawson knew that Diveroli did not grant a license or otherwise consent to use of the January 2012 Manuscript for quoting or creating quotations attributable to Diveroli.

36. Defendant Simon & Schuster, Inc. knew that Lawson had received written materials from Diveroli, which include, the January 2012 Manuscript.

37. Defendant Simon & Schuster, Inc. knew that Diveroli sought to review Lawson's manuscript that became *War Dogs*. *See* Ex. C.

38. Upon information and belief, Lawson informed Simon & Schuster, Inc. of the January 2012 Manuscript.

39. Upon information and belief, because of the corporate relationship between Defendant Simon & Schuster, Inc. and Defendant Simon & Schuster Digital Sales Inc., Defendant Simon & Schuster Digital Sales Inc. knew that neither IE nor Diveroli consented to the use of the January 2012 Manuscript for quoting or creating quotations attributable to Diveroli

40. With full knowledge of IE's rights, Defendants had access to the January 2012 Manuscript and copied text from it, infringing IE's copyright by displaying, publishing, and distributing the text in *War Dogs*. The text appearing in *War Dogs* is substantially similar to IE's copyrighted text:

| U.S. Copyright Registration TXu-985-899 | *War Dogs* |
|---|---|
| Well within months Im learning the ropes of the biz which mainly consists of servicing individual officers, agents and police departments by shipping everything from guns and ammo to boots and flashlights right | "From the beginning I was addicted to business," Diveroli recalled. "When I was working for my uncle, I had my own office and a couple of Mexican guys working for me, receiving and shipping the orders that I |

7

| U.S. Copyright Registration TXu-985-899 | *War Dogs* |
|---|---|
| to there front door via UPS etc.... Im also spending hours a day in my uncles walk in vaults (the place used to be a bank), full of machine guns, silencers and everything in between. Before my 16th birthday Im addicted to business, THE GUN BUSINESS. By now ive got my own office in my uncles company and have a few mexican workers of my own (whom I became pretty close with and liked very much) pulling and packing the constant stream of of phone and internet orders I am bringing into the company. – p. 1 | was bringing in. I was selling everything from guns and boots to flashlights to police all over the country. I was spending hours every day in my uncle's walk-in vault, where he kept a lot of machine guns, silencers, pistols." – P. 10 |
| at that point I realize this is something big something much bigger then I ever anticipated or even hoped for and I want a piece of it. – p. 2 | "It was much bigger than I had ever imagined or hoped for," Diveroli recalled. "I wanted a piece of it. I was going to bid on federal defense contracts. I was hell-bent." – p. 10 |
| So I start bidding/preparing to bid some govt contracts there working for my uncle as a matter of fact I thought we had a nice arrangment on all my sales/deals no salary and i think 40/60 split on the profit with of course "big jew" my uncle getting the lions share which I had absolutely no problem with, especially cause I was producing, by my estimation in about 18 months since I got serious about doing deals over there my uncle owed me like $150k based on the profit sharing formula he proposed. – p. 2 | Diveroli began vying for contracts using his uncle's money to finance the deals, along with his various gun licenses. The arrangement was that Diveroli would split the profits 60-40 with his uncle, with the youngster receiving the smaller share. In weeks, Diveroli had begun to win small contracts on FedBizOpps. Within eighteen months, he calculated that he'd earned $150,000 in commissions. – p. 10 |
| There was however tension between me and my uncle mainly due to things I was doing outside the office like smoking weed and not keeping kosher, jewish sabbath etc.... Finally i tell him to leave me alone and keep biz and personal seperate but he was looking for a punching bag at the time over some other shit he had going on with his father my grandfather and I geuss he thought i was a convenient target, WELL HE WAS WRONG . Sensing there was real trouble coming I demand payment or at least partial payment of the monies he has owed me . . . . he tells me to go fuck myself and within 48 hours I | "But there was tension between me and my uncle," Diveroli recalled. "It was mainly to do with stuff outside the office—like me smoking weed with the guys in the warehouse, not keeping kosher, not following the Sabbath. I told him to leave me alone—to keep personal and business separate. But I could see real trouble was coming, so I demanded at least partial payment of what he owed me. He told me to fuck myself. Within forty-eight hours I was on a plane to Miami to start my own business. One thing I knew for sure was that I was never going to take shit from any tyrant ever again." – pp. 10-11 |

8

| U.S. Copyright Registration TXu-985-899 | *War Dogs* |
|---|---|
| am on a plane back to Miami to start AEY, (i just dont know it yet) – p. 2 | |
| So I arrive back in Miami and Im hell bent on starting my own company and getting my own Federal Firearms license, so ill never have to take shit from a tyrant asshole unappreciative uncle or anybody again. – p. 3 | "I was hell-bent." – p. 10<br><br>"Within forty-eight hours I was on a plane to Miami to start my own business. One thing I knew for sure was that I was never going to take shit from any tyrant ever again." – p. 11 |
| I start cruising fedbizopps.gov lookibng for guns and ammo deals with ther Government, and i stumble upon a solicitation to supply 900,000 rounds of .223 55gr ball ammo to the United States of America Special Operations Command or better known as "USASOC", The contract officer was named Jerry . . . and he sort of explained to me some of the ground rules on making an offer to the Government, that basically this was NOT exactly the same as company to company transacations. – p. 3 | One morning in the summer of 2004, Diveroli came across a contract for nine hundred thousand rounds of .223-caliber, fifty-five-gram ball ammunition to Supply the Army's Special Operations Command in Fort Bragg, North Carolina. – p. 8<br><br>To get more information, Diveroli called the Army contracting officer listed online—Jerry was his name…. Jerry explained that bidding on federal contracts wasn't like a normal business-to-business transaction. – p. 9 |
| In any event I bid the contract based on a quotation of about $105 per 1,000 rounds from a company out of Kentucky and marked it up to $119.00 per 1,000 and offered it to USASOC. Three days later Jerry called and said you got it kid ! Up until that point it was the most exciting and scariest moment of my life all wrapped up in one, one one hand I had just secured my first contract with DOD on the other I had no fucking idea in the world how I was gonna fullfill it, but that sure as hell wouldnt stop me from trying. – p. 3 | Eventually he found a company in Kentucky that would sell him the ammo for $105 for each box of a thousand rounds, … Three days later, Jerry called: "You got it, kid." "It was the most exciting and scary moment of my life all at once," Diveroli recalled. "On one hand, I'd just secured my first contract with the Department of Defense. On the other hand, I had no fucking idea how I was going to actually deliver the ammo. But that wasn't going to stop me from trying." – p. 11 |
| So now not only did I NOT have enough $ to finance the project I did NOT have any PRODUCT to supply. I began frantically calling every ammo company in the US, pulling off marathon 18-20 runs in the office for a week straight, finally of all places I spoke to an ammunition manufacturer named American Ammunition in Hialeah, FL – p. 4 | "I began frantically calling every ammo company in the United States, pulling off marathon eighteen-to-twenty-hour stretches of work," Diveroli recalled. "Not only did I not have enough money—I didn't have the product to supply." Diveroli finally located a shady outfit near Miami run by a pair of Cuban expats. – pp. 11-12 |

9

| U.S. Copyright Registration TXu-985-899 | *War Dogs* |
|---|---|
| I was past the point of return there was no going back, I was meant to do this shit and thats what Im gonna do ! – p. 4 | "I was at the point of no return," Diveroli recalled. "I was meant to do this shit, and that was what I was going to do." – p. 12 |
| I mean I would buy say $100k worth of ammo from a company in New york with 50k down and 50k on net30 terms, and turn it into three $40k shipments going to Arizona, Louisiana and fuckin Texas !! not to many 18 year old can make $20k in a week legitimately and consistently, but I did. – p. 5 | "I'd buy a hundred thousand dollars' worth of ammo from a company in New York with fifty grand down and fifty grand on net-thirty-day terms," Diveroli recalled. "Then I'd chop the ammo into three different sales of forty grand each going to Arizona, Louisiana, and fucking Texas. That meant I had a profit of twenty thousand bucks. Not many eighteen-year-olds can make twenty grand in a week legitimately and consistently. But I was doing it." – p. 13 |
| my first contract over a million was for 10,000 bulletproof helmets, which i sold, delivered to the army in Iraq for i believe $125 a piece, I sourced them through a company in South Korea for $110 delivered, which left a profit of approximately $15 a helmet or $150,000 for the whole contract, they were to be delivered in 3 shipments, the only problem was that I did NOT at the time have the $300,000 neccesary to get this thing off the ground andI didn no where to find it – p. 7 | When Diveroli saw a contract to supply ten thousand bulletproof helmets to the Iraqi army, he began to scour the Internet for potential suppliers. Eventually, he found a Korean company willing to sell him that requisite amount for $110 each. Diveroli put in a bid of $125 per helmet and crossed his fingers…But there was a hitch once again: finance. The value of the contracts was $1.25 million and he needed $300,000 up front to pay for the first shipment. – pp. 17-18 |
| Smooth as a babys ass !!! and ralph immediately said he was interested in much more business, particularly where the US government the customer, so i started bidding govt contracts with him in mind and not long after that in 2005 i had my sights on a big upcoming Iraq bid for weapons and munitions, which I knew 100% I would need Ralph for, not only for $ but also supply, you see this bid required prices for enormous quantities of a wide range Nato and soviet style weapons and munitions , many of which i had never even heard of let alone dealt with, but I wasnt about to throw in the towel. – p. 7 | "Smooth as a baby's ass was how the first helmet deal went," Diveroli recalled. "Ralph immediately said he was interested in doing more business together, particularly if the United States government was the customer. I was, too. So I started bidding on government contracts with him in mind. I had my sights on the big Iraq contracts for weapons and munitions. I knew the government required an enormous quantity of Soviet Bloc arms and munitions—nonstandard arms. I hadn't even heard of most of the stuff they were after, let alone dealt with the weapons. But I wasn't going to throw in the towel." – p. 19 |

10

| U.S. Copyright Registration TXu-985-899 | *War Dogs* |
|---|---|
| I asked Ralph if he knew anybody who could help, and he said he did, he said there was a swiss gentlemen by the name of henri who had sold him uzi parts and other weapon parts/accesories in the past, they had a good working reationship, and had met several times. So at the beggining ralph just forwarded the email request for quote to henri directly and i had no direct contact, henri quoted aggresively on the project and between his quotes and my own sources we put in what we believed to be a very competitive offer. – p. 8 | Diveroli asked Merrill if he knew anyone who could source the different kinds of nonstandard weapons that were appearing in the solicitations. Merrill said he knew a Swiss man by the name of Henri who'd sold him Uzi parts in the past. Merrill said he knew a Swiss man by the name of Henri who'd sold him Uzi parts in the past. Merrill and Henri had a good working relationship and had met several times. Merrill started forwarding Diveroli's emails requesting quotes for AK-47s, heavy machine guns, and grenades to Henri. Diveroli had no direct contact with Henri, but he was able to quote aggressively, using Henri's low prices on surplus munitions. – p. 19 |
| Then about a month after we submitted our bid, I got the email that we won !!! we were awardeda $51,000,000 IDIQ contract to supply the Iraqi forces through a US ARMY FMS contract. There was one major caviat however, the ARMY had awarded the same damn contract to 4 other companies, you see the US ARMY had decided to stick it in us at the last minute, and instead of awarding everything to a single company in one shot , they would do what is called a "mini compete", where the 5 most competitive companies (ares being the most of course) would now have to bid for actual delivery orders under the multimillion dollar contracts they were just awarded. – p. 8 | "Then I got an e-mail saying that I'd won the contract," Diveroli recalled. "I'd won a fifty-one-million-dollar deal! I went out and celebrated like crazy But the next day I found out that there was one major caveat. The same damn contact had been awarded to four other companies at the same time." – p. 24 |
| Which meant in essence, that other than a small initial order of no more than $500k to each company, all we had really won was an exclusive invitation to keep smashing each other in another round of bidding, before any of us can realize the multimillion dollar order and profits we had all just celebrated. The companies involved were Taos, Blaine intl , DLS, AEY and I can remember the last one. (The signifiganceof naming them you will see | AEY received an intial order for $500,000 in ammunition, but the rest of the order was cut into small contracts for Diveroli and his adversaries to bid on companies like Taos, DLS, Blane International. "Later on I would learn the significance of these companies," Diveroli recalled, "but at the time I figured they were big companies and I was the little guy right away I started winning the mini- |

11

| U.S. Copyright Registration TXu-985-899 | *War Dogs* |
|---|---|
| later.) AEY started winning all of the mini competes – p. 9 | competes. I was beating the big boys at their own game." – p. 24 |

41.     The acts of Defendants complained of herein constitute infringement of IE's copyright and exclusive rights under copyright in violation of 17 U.S.C. §§ 106 and 501.

42.     Upon information and belief, the foregoing acts of infringement by Defendants have been willful, intentional, and purposeful, in disregard of and indifference to IE's rights.

43.     As a direct and proximate cause of the infringement by the Defendants of IE's copyright and exclusive rights under copyright, IE is entitled to damages and Defendants' profits pursuant to 17 U.S.C. § 504(b) for the infringement.

44.     Alternatively, IE is entitled to statutory damages of up to $150,000 per work infringed for Defendants' willful infringement of the January 2012 Manuscript, pursuant to 17 U.S.C. § 504(c).

45.     IE further is entitled to its attorney's fees and full costs pursuant to 17 U.S.C. § 505.

46.     Defendants' infringement has caused and continues to cause IE irreparable harm that cannot be fully redressed through damages alone.  An injunction as set forth herein is necessary to provide IE with complete relief.

## COUNT II – BREACH OF CONTRACT
### (Against Lawson)

47.     IE repeats and realleges the allegations of paragraphs 1 through 46 as if fully set forth herein.

48.     The Agreement between Lawson and Diveroli establish that Lawson agreed that "[Lawson] would never quote you [Diveroli] on anything without your consent, of course." Ex. B.

49. Diveroli never consented to Lawson's quoting Diveroli.

50. Lawson breached the Agreement by using the January 2012 Manuscript by using it to quote Diveroli in *War Dogs*.

51. Upon information and belief, Lawson used content in the January 2012 Manuscript to quote Diveroli to create an impression of authenticity to the readers of *War Dogs*.

52. As a result of Lawson's breach and, upon information and belief, Lawson's intent to solicit sales of *War Dogs* by attributing quotations to Diveroli, IE has suffered and will suffer further harm, including the loss of competitive position, customers, and goodwill, the amount of which will be difficult to ascertain.

53. IE is entitled to restitution for any damages incurred as a result of the breach by Lawson, including investigative costs.

### COUNT III –VIOLATION OF SECTION 43(a) OF THE LANHAM ACT
### (15 U.S.C. § 1125(a))
### (Against All Defendants)

54. IE repeats and realleges the allegations of paragraphs 1 through 53 as if fully set forth herein.

55. IE owns the rights to Diveroli's life story and intellectual property.

56. By including quotations attributable to Diveroli in *War Dogs*, Defendants caused likelihood of confusion or misunderstanding as to source, sponsorship, approval, affiliation, connection or association with or by Diveroli.

57. By including quotations attributable to Diveroli in *War* Dogs, consumers who desire to learn Diveroli's true story are likely to read *War Dogs*, rather than purchasing Diveroli's memoir.

58. IE had been in discussions with at least one third party beginning in December 2016 pertaining to the production and distribution of a documentary based on the material in the book "Once a Gun Runner . . ." and Diveroli's life story.

59. Accordingly, consumers who desire to learn Diveroli's true story are likely purchase *War Dogs* rather than purchasing Diveroli's memoir, or watching a documentary based on both the book "Once a Gun Runner . . ." and Diveroli's life story.

60. Defendants' conduct complained of herein constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

61. IE has been seriously and irreparably damaged as a result of Defendants' unlawful conduct and will continue to be seriously and irreparably damaged unless their conduct is enjoined.

62. Upon information and belief, as a result of the acts of Defendants, IE has suffered and will continue to suffer monetary damages in an amount not yet determined. Additionally, IE has incurred and will incur liability for costs and attorneys' fees.

63. Defendants' conduct complained of herein was intentional, malicious, and willful.

64. Unless Defendants are restrained and enjoined by this Court, their actions will continue to cause irreparable harm and injury to IE.

### COUNT IV – COMMON LAW UNFAIR COMPETITION
### (Against All Defendants)

65. IE repeats and realleges the allegations of paragraphs 1 through 64 as if fully set forth herein.

66. IE owns the rights to Diveroli's life story and intellectual property.

67. By including quotations attributable to Diveroli in *War Dogs*, Defendants caused likelihood of confusion or misunderstanding as to source, sponsorship, approval, affiliation, connection or association with or by Diveroli.

68. By including quotations attributable to Diveroli in *War* Dogs, consumers who desire to learn Diveroli's true story are likely to read *War Dogs*, rather than purchasing Diveroli's memoir.

69. IE had been in discussions with at least one third party beginning in December 2016 pertaining to the production and distribution of a documentary based on the material in the book "Once a Gun Runner . . ." and Diveroli's life story.

70. Accordingly, consumers who desire to learn Diveroli's true story are likely purchase *War Dogs* rather than purchasing Diveroli's memoir, or watching a documentary based on both the book "Once a Gun Runner . . ." and Diveroli's life story.

71. IE is entitled to recover from Defendants the greater of restitution for any damages sustained by IE as a result of IE's wrongful acts described in this Complaint or the value of Defendants' unjust enrichment in an amount to be determined at trial. IE is at present unable to ascertain the full extent of such damages.

72. By reason of the above alleged acts and conduct of Defendants, IE has suffered, and will continue to suffer, great harm and damage.

73. Defendants' actions were both willful and malicious, and IE is entitled to an award of punitive damages, attorneys' fees, and costs against Defendants

## JURY DEMAND

IE hereby demands a trial by jury on all issues so triable.

15

## **PRAYER FOR RELIEF**

WHEREFORE, IE requests that this Court enter judgment against Defendants as follows:

A. An adjudication that Defendants have infringed United States Copyright Registration TXu-985-899 in violation of 17 U.S.C §§ 106 and 501;

B. An adjudication that Defendants have willfully infringed TXu-985-899;

C. An order that Defendants' products and materials that infringe IE's copyrights, as well as any other articles that contain or embody copies of IE's copyrighted materials be destroyed pursuant to 17 U.S.C. § 503(b);

D. An award to IE of either (a) IE's actual damages and Defendants' profits, gains or advantages of any kind attributable to Defendants' infringement of IE's copyright registration; or (b) alternatively, statutory damages from Defendants of up to $150,000 per copyrighted work infringed pursuant to 17 U.S.C. § 504;

E. An adjudication that Lawson beached the Agreement and an award to IE of damages IE has sustained as a result of Lawson's breach in an amount according to proof;

F. An accounting for all profits, income, receipts, or other benefits derived by Defendants as a result of their unlawful conduct;

G. An award to IE of its costs, expenses and attorneys' fees pursuant to 17 U.S.C. § 505;

H. An award to IE of damages adequate to compensate IE for Defendants' unfair competition;

I. A finding that this case against Defendants is exceptional and an award of IE's costs, expenses and attorneys' fees pursuant to 15 U.S.C. § 1117(a);

J.	A finding that this case against Defendants is exceptional and an award of IE's costs, expenses and attorneys' fees pursuant to 6 Del. C. § 2533(b);

K.	An award to IE of pre-judgment and post-judgment interest on all applicable damages;

L.	A permanent injunction enjoining Defendants and their agents, servants, and employees, and all persons and/or entities acting under, in concert with, or for them, from infringing IE's copyrighted material;

M.	An award to IE of such further relief at law or in equity as the Court deems just and proper.

Dated:  June 5, 2018                           STAMOULIS & WEINBLATT LLC

*/s/ Richard C. Weinblatt*
Stamatios Stamoulis #4606
Richard C. Weinblatt #5080
Two Fox Point Centre
6 Denny Road, Suite 307
Wilmington, DE 19809
(302) 999-1540
stamoulis@swdelaw.com
weinblatt@swdelaw.com

*Attorneys for Plaintiff*
*Incarcerated Entertainment, LLC*