EXHIBIT 28

# The New York Times

ASIA PACIFIC

# Supplier Under Scrutiny on Arms for Afghans

By C. J. CHIVERS    MARCH 27, 2008

*This article was reported by C. J. Chivers, Eric Schmitt and Nicholas Wood and written by Mr. Chivers.*

Since 2006, when the insurgency in Afghanistan sharply intensified, the Afghan government has been dependent on American logistics and military support in the war against Al Qaeda and the Taliban.

But to arm the Afghan forces that it hopes will lead this fight, the American military has relied since early last year on a fledgling company led by a 22-year-old man whose vice president was a licensed masseur.

With the award last January of a federal contract worth as much as nearly $300 million, the company, AEY Inc., which operates out of an unmarked office in Miami Beach, became the main supplier of munitions to Afghanistan's army and police forces.

Since then, the company has provided ammunition that is more than 40 years old and in decomposing packaging, according to an examination of the munitions by The New York Times and interviews with American and Afghan officials. Much of the ammunition comes from the aging stockpiles of the old Communist bloc,

including stockpiles that the State Department and NATO have determined to be unreliable and obsolete, and have spent millions of dollars to have destroyed.

In purchasing munitions, the contractor has also worked with middlemen and a shell company on a federal list of entities suspected of illegal arms trafficking.

Moreover, tens of millions of the rifle and machine-gun cartridges were manufactured in China, making their procurement a possible violation of American law. The company's president, Efraim E. Diveroli, was also secretly recorded in a conversation that suggested corruption in his company's purchase of more than 100 million aging rounds in Albania, according to audio files of the conversation.

This week, after repeated inquiries about AEY's performance by The Times, the Army suspended the company from any future federal contracting, citing shipments of Chinese ammunition and claiming that Mr. Diveroli misled the Army by saying the munitions were Hungarian.

Mr. Diveroli, reached by telephone, said he was unaware of the action. The Army planned to notify his company by certified mail on Thursday, according to internal correspondence provided by a military official.

But problems with the ammunition were evident last fall in places like Nawa, Afghanistan, an outpost near the Pakistani border, where an Afghan lieutenant colonel surveyed the rifle cartridges on his police station's dirty floor. Soon after arriving there, the cardboard boxes had split open and their contents spilled out, revealing ammunition manufactured in China in 1966.

"This is what they give us for the fighting," said the colonel, Amanuddin, who like many Afghans has only one name. "It makes us worried, because too much of it is junk." Ammunition as it ages over decades often becomes less powerful, reliable and accurate.

AEY is one of many previously unknown defense companies to have thrived since 2003, when the Pentagon began dispensing billions of dollars to train and equip indigenous forces in Afghanistan and Iraq. Its rise from obscurity once seemed

to make it a successful example of the Bush administration's promotion of private contractors as integral elements of war-fighting strategy.

But an examination of AEY's background, through interviews in several countries, reviews of confidential government documents and the examination of some of the ammunition, suggests that Army contracting officials, under pressure to arm Afghan troops, allowed an immature company to enter the murky world of international arms dealing on the Pentagon's behalf — and did so with minimal vetting and through a vaguely written contract with few restrictions.

In addition to this week's suspension, AEY is under investigation by the Department of Defense's inspector general and by Immigration and Customs Enforcement, prompted by complaints about the quality and origins of ammunition it provided, and allegations of corruption.

Mr. Diveroli, in a brief telephone interview late last year, denied any wrongdoing. "I know that my company does everything 100 percent on the up and up, and that's all I'm concerned about," he said.

He also suggested that his activities should be shielded from public view. "AEY is working on a moderately classified Department of Defense project," he said. "I really don't want to talk about the details."

He referred questions to a lawyer, Hy Shapiro, who offered a single statement by e-mail. "While AEY continues to work very hard to fulfill its obligations under its contract with the U.S. Army, its representatives are not prepared at this time to sit and discuss the details," he wrote.

As part of the suspension, neither Mr. Diveroli nor his company can bid on any further federal work until the Army's allegations are resolved. But he will be allowed to provide ammunition already on order under the Afghan contract, according to internal military correspondence.

In January, American officers in Kabul, concerned about munitions from AEY, had contacted the Army's Rock Island Arsenal, in Illinois, and raised the possibility of terminating the contract. And officials at the Army Sustainment Command, the

contracting authority at the arsenal, after meeting with AEY in late February, said they were tightening the packaging standards for munitions shipped to the war.

And yet after that meeting, AEY sent another shipment of nearly one million cartridges to Afghanistan that the Combined Security Transition Command-Afghanistan regarded as substandard. Lt. Col. David G. Johnson, the command spokesman, said that while there were no reports of ammunition misfiring, some of it was in such poor condition that the military had decided not to issue it. "Our honest answer is that the ammunition is of a quality that is less than desirable; the munitions do not appear to meet the standards that many of us are used to," Colonel Johnson said. "We are not pleased with the way it was delivered."

Several officials said the problems would have been avoided if the Army had written contracts and examined bidders more carefully.

Public records show that AEY's contracts since 2004 have potentially been worth more than a third of a billion dollars. Mr. Diveroli set the value higher: he claimed to do $200 million in business each year.

Several military officers and government officials, speaking on condition of anonymity because of the investigations, questioned how Mr. Diveroli, and a small group of men principally in their 20s and without extensive military or procurement experiences, landed so much vital government work.

"A lot of us are asking the question," said a senior State Department official. "How did this guy get all this business?"

**An Ambitious Company**

The intensity of the Afghan insurgency alarmed the Pentagon in 2006, and the American unit that trains and equips Afghan forces placed a huge munitions order through an Army logistics command.

The order sought 52 types of ammunition: rifle, pistol and machine-gun cartridges, hand grenades, rockets, shotgun slugs, mortar rounds, tank ammunition and more. In all, it covered hundreds of millions of rounds. Afghan forces primarily

use weapons developed in the Soviet Union. This meant that most munitions on the list could be bought only overseas.

AEY was one of 10 companies to bid by the September 2006 deadline.

Michael Diveroli, Efraim's father, had incorporated the company in 1999, when Efraim was 13. For several years, a period when the company appeared to have limited activity, Michael Diveroli, who now operates a police supply company down the street from AEY's office, was listed as the company's sole executive.

In 2004, AEY listed Efraim Diveroli, then 18, as an officer with a 1 percent ownership stake.

The younger Diveroli's munitions experience appeared to be limited to a short-lived job in Los Angeles for Botach Tactical, a military and police supply company owned by his uncle, Bar-Kochba Botach.

Mr. Diveroli cut off an interview when asked about Botach Tactical. Mr. Botach, reached by telephone, said that both Michael and Efraim Diveroli had briefly worked for him, but that after seeing the rush of federal contracts available after the wars began, they had struck out on their own.

"They just left me and took my customer base with them," he said. "They basically said: 'Why should we work for Botach? Let's do it on our own.'"

As Efraim Diveroli arrived in Miami Beach, AEY was transforming itself by aggressively seeking security-related contracts.

It won a $126,000 award for ammunition for the Special Forces; AEY also provided ammunition or equipment in 2004 to the Department of Energy, the Environmental Protection Agency, the Transportation Security Administration and the State Department.

By 2005, when Mr. Diveroli became AEY's president at age 19, the company was bidding across a spectrum of government agencies and providing paramilitary equipment — weapons, helmets, ballistic vests, bomb suits, batteries and chargers for X-ray machines — for American aid to Pakistan, Bolivia and elsewhere.

It was also providing supplies to the American military in Iraq, where its business included a $5.7 million contract for rifles for Iraqi forces.

Two federal officials involved in contracting in Baghdad said AEY quickly developed a bad reputation. "They weren't reliable, or if they did come through, they did after many excuses," said one of them, who asked that his name be withheld because he was not authorized to speak with reporters.

By this time, pressures were emerging in Efraim Diveroli's life. In November 2005, a young woman sought an order of protection from him in the domestic violence division of Dade County Circuit Court.

The woman eventually did not appear in court, and her allegations were never ruled on. But in court papers, the woman said that after her relationship with Mr. Diveroli ended, he stalked her and left threatening messages.

Once, according to the file, his behavior included "shoving her to the ground and refusing to allow her to leave during a verbal dispute." Other times, she reported, Mr. Diveroli arrived at her home unannounced and intoxicated "going about the exterior, banging on windows and doors."

The woman worried that she could not ignore him, court records said, because his behavior frightened her.

Mr. Diveroli sought court delays on national security grounds. "I am the President and only official employee of my business," he wrote to the judge on Dec. 8, 2005. "My business is currently of great importance to the country as I am licensed Defense Contractor to the United States Government in the fight against terrorism in Iraq and I am doing my very best to provide our troops with all their equipment needs on pending critical contracts."

As AEY's bid for its largest government contract was being considered, Mr. Diveroli's personal difficulties continued. On Nov. 26, 2006, the Miami Beach police were called to his condominium during an argument between him and another girlfriend. According to the police report, he had thrown her "clothes out in the hallway and told her to get out."

A witness told the police Mr. Diveroli had dragged her back into the apartment. The police found the woman crying; she said she had not been dragged. Mr. Diveroli was not charged.

On Dec. 21, 2006, the police were called back to the condominium. Mr. Diveroli and AEY's vice president, David M. Packouz, had just been in a fight with the valet parking attendant.

The fight began, the police said, after the attendant refused to give Mr. Diveroli his keys and Mr. Diveroli entered the garage to get them himself. A witness said Mr. Diveroli and Mr. Packouz both beat the man; police photographs showed bruises and scrapes on his face and back.

When the police searched Mr. Diveroli, they found he had a forged driver's license that added four years to his age and made him appear old enough to buy alcohol as a minor. His birthday had been the day before.

"I don't even need that any more," he told the police, the report said. "I'm 21 years old."

Mr. Diveroli was charged with simple battery, a misdemeanor, and felony possession of a stolen or forged document.

The second charge placed his business in jeopardy. Mr. Diveroli had a federal firearms license, which was required for his work. With a felony conviction, the license would be nullified.

(Mr. Packouz was charged with battery and the charge was later dropped; he declined to be interviewed. To avoid a conviction on his record, Mr. Diveroli entered a six-month diversion program for first offenders in May 2007 that spared him from standing trial.)

A relative paid Mr. Diveroli's $1,000 bail as his bid for the Afghan contract was in its final review.

To be accepted, the company had to be, in Army parlance, "a responsible contractor," which required an examination of its financial soundness, transport

capabilities, past performance and compliance with the law and government contracting regulations.

The week after a relative paid his bail, the Banc of America Investment Services in Miami provided Mr. Diveroli a letter certifying that his company had cash on hand to begin buying munitions on a large scale. It said AEY had $5,469,668.95 in an account.

AEY was awarded the contract in January 2007. Asked why it chose AEY, the Army Sustainment Command answered in writing: "AEY's proposal represented the best value to the government."

**Eastern Bloc Arsenals**

Both the Army and AEY have treated the sources of the ammunition the company purchases as confidential matters, declining to say how and where the company obtained it, the prices paid or the quantities delivered.

But records provided by an official concerned about the company's performance, a whistle-blower in the Balkans and an arms-trafficking researcher in Europe, as well as interviews with several people who work in state arsenals in Europe, show that AEY shopped from stocks in the old Eastern bloc, including Albania, Bulgaria, the Czech Republic, Hungary, Kazakhstan, Montenegro, Romania and Slovakia.

These stockpiles range from temperature-controlled bunkers to unheated warehouses packed with exposed, decaying ammunition. Some arsenals contain ammunition regarded in munitions circles as high quality. Others are scrap heaps of abandoned Soviet arms.

The Army's contract did little to distinguish between the two.

When the United States or NATO buys munitions for themselves, the process is regulated by quality-assurance standards that cover manufacturing, packaging, storage, testing and transport.

The standards exist in part because munitions are perishable. As they age, propellants and explosives degrade, and casings are susceptible to weathering. Environmental conditions — humidity, vibration, temperature shifts — accelerate decay, making munitions less reliable.

NATO rules require ammunition to be tested methodically over its life; samples are fired through braced weapons, and muzzle velocities and accuracy are recorded.

For rifle cartridges, testing begins at age 10 years, according to Peter Courtney-Green, chief of the Ammunition Support Office of NATO's Maintenance and Supply Agency.

The Soviet Union, which designed the ammunition that AEY bought, developed similar tests, which are still in use. But when the Army wrote its Afghan contract, it did not enforce either NATO or Russian standards. It told bidders only that the munitions must be "serviceable and issuable to all units without qualification."

What this meant was not defined. An official at the Army Sustainment Command said that because the ammunition was for foreign weapons, and considered "nonstandard," it only had to fit in weapons it was intended for.

"There is no specific testing request, and there is no age limit," said Michael Hutchison, the command's deputy director for acquisition. "As the ammunition is not standard to the U.S. inventory, the Army doesn't possess packaging or quality standards for that ammo."

When purchasing such munitions, Mr. Hutchison said, the Army Sustainment Command relies on standards from the "customer" — meaning the Army units in Afghanistan. And the customer, he said, did not set age or testing requirements.

With the vague standards in hand, AEY canvassed the field. One stop was Albania, a fortress state during Soviet times now trying to join NATO. Albania has huge stocks of armaments, much if it provided by China in the 1960s and 1970s.

The quality of these stockpiles vary widely, said William D. G. Hunt, a retired British ammunition technical officer who assessed the entire stock for Albania's Ministry of Defense from 1998 to 2002. He said a military planning to use the

munitions had reason to worry: at least 90 percent of the stockpile was more than 40 years old.

"If there was any procurement made for combat purposes from that stockpile, I would be very dubious about it," he said. "I am not suggesting that all the ammunition would fail. But its performance would tail off rather dramatically. It is substandard, for sure."

Problems with Albania's decaying munitions were apparent earlier this month, when a depot outside Tirana, Albania's capital, erupted in a chain of explosions, killing at least 22 people, injuring at least 300 others and destroying hundreds of homes.

Before the Army's contractors began shopping from such depots, the West's assessment of Albanian munitions was evident in programs it sponsored to destroy them. Through 2007, the United States had contributed $2 million to destroy excess small-caliber weapons and 2,000 tons of ammunition in Albania, according to the State Department.

A NATO program that ended last year involved 16 Western nations contributing about $10 million to destroy 8,700 tons of obsolete ammunition. The United States contributed $500,000. Among the items destroyed were 104 million 7.62 millimeter cartridges — exactly the ammunition AEY sought from the Albanian state arms export agency.

Albania offered to sell tens of millions of cartridges manufactured as long ago as 1950. For tests, a 25-year-old AEY representative was given 1,000 cartridges to fire, according to Ylli Pinari, the director of the arms export agency at the time of the sale.

No ballistic performance was recorded, he said. The rounds were fired by hand.

On that basis, AEY bought more than 100 million cartridges for the Pentagon's order. The cartridges, according to packing lists, dated to the 1960s.

The company also hired a local businessman, Kosta Trebicka, to remove the ammunition from its wooden crates and hermetically sealed metal boxes — the

standard military packaging that protects munitions from moisture and dirt, and helps ensure its reliability and ease of transport in the field.

Mr. Trebicka, in interviews, said Mr. Diveroli wanted to discard the crates and metal boxes to reduce the weight and cost of air shipments and maximize profits. Several American officials said they suspected that the packaging was removed because it bore Chinese markings and the ammunition's age.

**The Czech Connection**

As the cartridges in Albania were being prepared for shipment to Afghanistan, Mr. Diveroli began seeking ammunition from the Czech Republic to fill an order for Iraq's Interior Ministry.

In May 2007, according to two American officials, the Czech government contacted the American Embassy in Prague with a concern: AEY was buying nine million cartridges through Petr Bernatik, a Czech citizen who had been accused by Czech officials of illegal arms trafficking.

The accusations included shipments of rocket-propelled grenades in violation of an international embargo to Congo, and illegal shipments of firearms to Slovakia.

Mr. Bernatik had publicly denied both accusations. But they were deemed credible enough in Washington that he was listed on the Defense Trade Controls watch list, according to one of the American officials.

This list, maintained by the State Department, is used to prevent American dealers from engaging suspicious traders in their business, in part to prevent legal arms companies from enriching or legitimizing black-market networks.

AEY has never been implicated in black-market sales. But the Czech government, which had discretion over the sale, asked the American Embassy if it wanted Mr. Bernatik involved in AEY's deals, according to the two American officials, who requested anonymity because they were not authorized to share the contents of diplomatic discussions.

The United States did not try to block the transaction, one of the American officials said, in part because equipping Iraq was in the United States' interest, and also because Mr. Bernatik had been accused, not convicted.

On May 7, 2007, the Czech government issued an export license. Mr. Bernatik, in a telephone interview, said he arranged seven flights to Iraq for AEY last year. "We have a normal business collaboration," he said.

### A Mysterious Middleman

The international arms business operates partly in the light and partly in shadows, and is littered with short-lived shell companies, middlemen and official corruption. Governments have tried to regulate it more closely for years, with limited success.

As Mr. Diveroli began to fill the Army's huge orders, he was entering a shadowy world, and in his brief interview he suggested that he was aware that corruption could intrude on his dealings in Albania. "What goes on in the Albanian Ministry of Defense?" he said. "Who's clean? Who's dirty? Don't want to know about it."

The way AEY's business was structured, Mr. Diveroli, at least officially, did not deal directly with Albanian officials. Instead, a middleman company registered in Cyprus, Evdin Ltd., bought the ammunition and sold it to his company.

The local packager involved in the deal, Mr. Trebicka, said that he suspected that Evdin's purpose was to divert money to Albanian officials.

The purchases, Mr. Trebicka said, were a flip: Albania sold ammunition to Evdin for $22 per 1,000 rounds, he said, and Evdin sold it to AEY for much more. The difference, he said he suspected, was shared with Albanian officials, including Mr. Pinari, then the head of the arms export agency, and the defense minister at the time, Fatmir Mediu.

(Mr. Mediu resigned last week after the ammunition depot explosions; Mr. Pinari was arrested.) The Albanian government has been infuriated by Mr. Trebicka's allegations. Sali Berisha, the prime minister, Mr. Mediu and Mr. Pinari all denied involvement in kickbacks. But Mr. Trebicka said that after he raised his

concerns about Evdin with the Defense Ministry, his company was forced from the repackaging contract.

On June 11, 2007, Mr. Trebicka and Mr. Diveroli commiserated by phone about problems with doing business in Albania. Mr. Trebicka surreptitiously recorded the conversation, and later gave the audio files to American investigators.

The conversation, he said, showed that the American company was aware of corruption in its dealings in Albania and that Heinrich Thomet, a Swiss arms dealer, was behind Evdin.

In the recordings, which Mr. Trebicka shared with The Times, Mr. Diveroli suggests that Mr. Thomet, called "Henri," was acting as the middleman.

"Pinari needs a guy like Henri in the middle to take care of him and his buddies, which is none of my business," Mr. Diveroli said. "I don't want to know about that business. I want to know about legitimate businesses."

Mr. Diveroli recommended that Mr. Trebicka try to reclaim his contract by sending "one of his girls" to have sex with Mr. Pinari. He suggested that money might help, too.

"Let's get him happy; maybe he gives you one more chance," he said. "If he gets $20,000 from you … "

At the end, Mr. Diveroli appeared to lament his business with Albania. "It went up higher to the prime minister and his son," he said. "I can't fight this mafia. It got too big. The animals just got too out of control."

In e-mail exchanges, Mr. Thomet denied an official role in Evdin. His involvement in the Albania deal, he said, had been in introducing Mr. Diveroli to potential partners and officials. Bogdan Choopryna, Evdin's general manager, also said Mr. Diveroli's allegations were not true. "We listen to the words of Mr. Diveroli, and then I am responsible for what he is saying?" he said. In addition to being an official with Evdin, Mr. Choopryna, 27, markets products for a Swiss company run by Mr. Thomet.

The dispute about Evdin's role and who owns it remains publicly unresolved. Evdin had incorporated on Sept. 26, 2006 — the week after Mr. Diveroli bid on the Afghan contract, according to Cyprus's registrar. The company listed its office in Larnaca, Cyprus, and its general director as Pambos Fellas.

A visit by a reporter to the address found an accounting business above a nightclub. Evdin had no office or staff there. And Mr. Fellas, who was inside, said that he was not Evdin's general director, but "a nominee director" whose sole role was to register the company.

He had registered hundreds of such companies for a fee, he said, and knew nothing of Evdin's business.

Some signs point back to Switzerland. Mr. Pinari initially told two reporters that he worked with Evdin via Mr. Thomet. (After a reporter told Mr. Thomet this, Mr. Pinari changed his story, referring the reporter to Mr. Fellas and Evdin's office in Cyprus.) Mr. Diveroli also said the Cyprus company was run by a "Swiss individual."

Mr. Thomet has been accused in the past by private groups, including Amnesty International, of arranging illegal arms transfers under a shifting portfolio of corporate names. His activities have also caused concern in Washington, where, like Mr. Bernatik, he and Evdin are on the Defense Trade Controls watch list, an American official said.

Mr. Thomet said past claims that he had engaged in illegal arms trading were caused by "false statements by former competitors."

Hugh Griffiths, operations manager of the Arms Transfer Profile Initiative, a private organization that researches illicit arms transfers, described Mr. Thomet as a broker with contacts in former Eastern bloc countries with stockpiles and arms factories. His proximity to AEY's purchases, Mr. Griffiths said, raised questions about whether the Pentagon was adequately vetting the business done in its name.

"Put very simply, many of the people involved in smuggling arms to Africa are also exactly the same as those involved in Pentagon-supported deals, like AEY's shipments to Afghanistan and Iraq," he said.

Under the suspension ordered Wednesday, the Army planned to continue accepting ammunition it had already ordered from AEY. As of March 21, it had ordered $155 million of munitions, according to the Army Sustainment Command.

In Afghanistan, American munitions officers are examining all of the small-arms ammunition AEY has shipped. The final shipment, which arrived in wooden crates, included loose and corroded cartridges, according to three officers. At Rock Island Arsenal, the contracting authority said it was cooperating with investigators, who have also visited Albania and Afghanistan.

And in Miami Beach, even before the suspension, AEY had lost staff members. Michael Diveroli, the company's founder, told a reporter that he no longer had any relationship with the company. Mr. Packouz, who was AEY's vice president, and Levi Meyer, 25, who was briefly listed as general manager, had left the company, too.

Mr. Meyer offered a statement: "I'm not involved in that mess anymore."

C. J Chivers reported from Nawa, Afghanistan, Russia and Ukraine; Eric Schmitt from Washington and Miami Beach; and Nicholas Wood from Tirana, Albania. Reporting was contributed by Alain Delaquérière and Margot Williams from New York, James Glanz from Baghdad, and Stefanos Evripidou from Cyprus.

A version of this article appears in print on March 27, 2008, on Page A1 of the New York edition with the headline: Supplier Under Scrutiny on Aging Arms for Afghans.

© 2018 The New York Times Company